**JOHNSON v. DYE, Warden.**

No. 9471.

United States Court of Appeals
Third Circuit.

Argued March 18, 1948.

Reargued March 21, 1949.

Decided May 17, 1949.

O'CONNELL, Circuit Judge, dissenting in part.

———◆———

Hymen Schlesinger, Pittsburgh, Pa., for appellant.

Schlesinger & Schlesinger and Samuel J. Goldstein, Pittsburgh, Pa., on the brief, for American Civil Liberties Union, amicus curiae.

Craig T. Stockdale and Leonard H. Levenson, Assistant District Attorneys, Pittsburgh, Pa. (William S. Rahauser, District Attorney, Leo J. Kelly, Jr., and Louis L. Kaufman, Assistant District Attorneys, Pittsburgh, Pa., on the brief), for appellee.

Before BIGGS, Chief Judge, and MARIS, GOODRICH, McLAUGHLIN, O'CONNELL, and KALODNER, Circuit Judges.

Opinion of the Court. (Filed May 17, 1949.)

BIGGS, Chief Judge.

### The Facts.

■ The petitioner, Leon Johnson, is in the custody of the Commonwealth of Pennsylvania and is presently confined in the Allegheny County Jail, of which the respondent, Charles L. Dye, is the Warden. Johnson was indicted in the Cobb County Superior Court of the State of Georgia for the murder of one Sarah Frances Thompson on December 6, 1942. He was tried by a jury which found him guilty of murder with a recommendation of mercy on January 25, 1943. Under the law of Georgia, Georgia Code Annotated, 1935, Title 26, § 1005, the recommendation of the jury fixed the penalty at life imprisonment. The court thereupon sentenced Johnson to hard labor for life.[1] In June, 1943, the petitioner escaped from a Georgia chain gang and eventually came to Allegheny County, Pennsylvania. Governor Arnall of Georgia dispatched a requisition for extradition to Governor James of Pennsylvania

---

[1] The Court apparently exceeded its authority in sentencing Johnson to hard labor. The law of Georgia authorizes "confinement and labor," where the sentence includes imprisonment. See Georgia Code Annotated, Title 27, Sec. 2504. However, this unlawful imposition of hard labor to the sentence of imprisonment does not of itself render the sentence void so as to entitle the prisoner to discharge on habeas corpus. See Harlan v. McGourin, 218 U.S. 442, 31 S.Ct. 44, 54 L.Ed. 1101, 21 Ann.Cas. 849; United States v. Pridgeon, 153 U.S. 48, 14 S.Ct. 746, 38 L.Ed. 631.

who issued an executive warrant under which Johnson was apprehended. We assume that the application for extradition was made pursuant to the Uniform Criminal Extradition Act, Laws of Pennsylvania 1941, July 8, P.L. 288, 19 P.S.Pa. § 191.1. See also the so-called "Interstate Extradition Act," R.S. §§ 5278-5279, 18 U.S.C.A. §§ 662-663. So far as appears Governor James did not call on the Attorney General or any prosecuting officer of Pennsylvania as he was authorized to do under the Act to investigate the demand made by the State of Georgia. See Laws of Pennsylvania 1941, P.L. 288, 19 P.S. Pa. § 191.4. Johnson petitioned the Court of Common Pleas of Allegheny County for a writ of habeas corpus at its No. 3679, April Term, 1946. There is no copy of Johnson's petition to that Court or the proceedings therein in the record. The Court of Common Pleas apparently[2] refused to free Johnson and discharged the writ. The Court of Common Pleas was under the impression that Johnson had pleaded guilty to the indictment in Georgia.[3] The decision was reviewed by the Superior Court of Pennsylvania which affirmed the judgment of the court below. 159 Pa.Super. 542, 49 A.2d 195. No review seems to have been sought by Johnson in the Supreme Court of Pennsylvania or in the Supreme Court of the United States. On November 14, 1946 Johnson petitioned the court below for a writ of habeas corpus. After the issuance of a rule to show cause on the petition and upon answers[4] filed

and after a full hearing the court below filed an opinion, 71 F.Supp. 262, and discharged the writ. Johnson appealed to this court.

We must state at the outset that it is difficult to dispose of the questions of law raised by the instant appeal on the record now before us.[5] It appears, however, from Johnson's petition in the court below that the grounds asserted by him for the issuance of the writ were three-fold. He alleged (1) that his constitutional rights had been violated at his trial for murder in Georgia in that "several witnesses" who testified against him were compelled to do so by "certain police authorities of Cobb County, Georgia"; (2) that following his conviction he was "committed to a chain gang * * * and was the victim of cruel, barbaric and inhuman treatment at the hands of his jailors to the extent that his life and health were in grave jeopardy"; and (3) that "* * * in the event he is returned to the State of Georgia to complete his unfinished sentence his life will be endangered and he fears that if he is returned there is danger that he will meet his death by mob violence and be so brutalized or tortured by his jailors that he will succumb." On March 14, 1947 Johnson amended his petition by reasserting ground (1) supra in slightly different terms and adding that the testimony of the "coerced and intimidated witnesses was material, resulted in his conviction and in truth and fact was wholly false and perjured, as the prosecuting authorities well

---

[2] No copy of the court's order is included in the present record.

[3] We make this statement because it appears from the brief of the appellee in the Superior Court of Pennsylvania on the appeal from the decision of the Court of Common Pleas that the Judge of the Court of Common Pleas said: "I have made up my mind about it. The man [Johnson] admitted he plead guilty to murder and the proceedings are regular from my viewpoint." Johnson did state at the hearing before the Court of Common Pleas that he pleaded guilty to the Georgia indictment. The record of the proceedings before the Cobb County Superior Court of the State of Georgia demonstrates clearly, however, that Johnson's statement was incorrect. The Court of Common Pleas of Allegheny County, however, did not receive the rec-

ord of the proceedings in the Cobb County Court until after it had rendered its decision against Johnson in the habeas corpus proceeding.

[4] An answer was filed by the United States by the United States District Attorney. The answer filed by the United States District Attorney states that, "The rule to show cause has not been served on the United States Attorney for this District * * * but the Clerk of Court seems to be of the opinion that an answer should be filed by the United States Attorney."

[5] We attempted to supplement the record brought to this court by the parties by our order of August 11, 1948, directing the Clerk of the District Court to transmit all records of the court below in the instant case to this court.

knew." In the view that we take of this case it is unnecessary to pass upon ground (3), supra.

■ In the court below the petitioner supported the allegations of ground (1) by his own testimony and those of ground (2) by his own testimony and by that of other witnesses, all of whom, save one, were escaped convicts from Georgia who happened to be lodged in the Allegheny County jail. The remaining witness was a former officer in the Army of the United States who had spent a portion of his service in Georgia and who was then confined in the Allegheny County jail having previously escaped from detention in Pittsburgh following his arrest for an alleged felonious assault. The testimony of these witnesses as well as that of the petitioner established that it was the custom of the Georgia authorities to treat chain gang prisoners with persistent and deliberate brutality at or about the time the petitioner was suffering punishment and for some years thereafter, certainly as late as May in the year 1946. There was also evidence which showed that Negro prisoners were treated with a greater degree of brutality than white prisoners though it is difficult to make fine distinctions as to degrees of brutality. A copy of the magazine "Life", issue of November 1, 1943, in particular an article entitled "Georgia Prisons," with a subtitle "State Abolishes Old Abuses," pp. 93-99, and a copy of the magazine "Time", issue of September 13, 1943, in particular an article entitled "Prisons" with the subtitle "Georgia's Middle Ages," pp. 23-24, were introduced in evidence. Certain other newspaper articles were introduced also but these with one exception, "PM's Picture News, Magazine Section," November 2, 1947, which reports in full the Report of the President's Committee on Civil Rights, are not in the record.[6] Several of the petitioner's witnesses in support of the petition for habeas corpus testified that the conditions described by the articles in "Life" and "Time" correctly represented certain conditions but the witnesses stated in substance that the articles did not go far enough. Irrespective of whether or not articles in magazines of national circula-

tion are admissible as evidence, the contents of the articles referred to were employed by some of the witnesses as a basis of comparison for conditions in Georgia camps personally known to them. Because of this we may consider the contents of the articles as did the court below. Counsel for the respondent urged in the court below that the article in "Life" proved that the abuses of the Georgia prison system had been obliterated by the Georgia Act of 1943, Special Sess., page 5; but this assertion, as we have stated, was contradicted in major part by certain of the petitioner's witnesses. No testimony was offered on behalf of the State of Georgia or by the respondent.

### The Law.

*As to the Alleged Coercion and Intimidation of a Witness or Witnesses.*

The court below in its opinion reviewed the proceedings for habeas corpus had on behalf of the petitioner in the Pennsylvania State Courts and, with a reference to the limited jurisdiction conferred upon the justices and judges of the United States to enlarge a prisoner by writ of habeas corpus under Sections 451, 452 and 453 of Title 28 U.S.C.A. (now superseded by Sections 2241, 2242 of Revised Title 28 U.S.C.A.), and to the cases of Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L. Ed. 791, 98 A.L.R. 406; Pyle v. Kansas, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214; and Hawk v. Olson, 326 U.S. 271, 66 S.Ct. 116, 90 L.Ed. 61, concluded that if the facts as alleged in the petition were shown to be true, Johnson "would be entitled to the remedy set forth in Mooney v. Holohan" [71 F. Supp. 262, 265]. The learned trial judge stated, however, "There is *no evidence* in his case that witnesses, who testified at his trial in the State Court in Georgia, were compelled to do so; there is *no evidence* that they gave perjured testimony, *nor is there any evidence* [7] that the State of Georgia or its officers or agents, knew that perjured testimony was used against the relator." This statement of the trial court was erroneous. There was Johnson's own testimony to support his contentions in regard to the alleged perjured, coerced testimony of a

---

[6] Their absence is not adequately explained.

[7] Emphasis added throughout.

witness at his trial for murder and to the knowledge of the State of Georgia through its officers in this regard. The court below may have found Johnson's testimony incredible but the learned trial judge did not say so. But in the view which we take it is unnecessary to resolve the question whether a witness was intimidated at Johnson's trial in Cobb County, Georgia.

*As to the Application of the Eighth Amendment of the Constitution of the United States by Implementation Under the Fourteenth Amendment.*

As to the second ground raised by Johnson the court below stated, "There is evidence that Johnson received cruel treatment after he had been convicted of murder and while he was serving his sentence therefor. However, such treatment would not entitle him to his liberty as it does not constitute a custody of relator in violation of the Constitution or laws of the United States. 28 U.S.C.A. § 453. The 8th Amendment is not a limitation upon the States. Collins v. Johnston, 237 U.S. 502, 503, 510, 511, 35 S.Ct. 649, 59 L.Ed. 1071." We deem the first sentence quoted in this paragraph to constitute a finding by the court below that Johnson had been subjected to cruel treatment following his conviction. It is obvious also that in using the phrase "cruel treatment" the court below was referring to the cruel and unusual punishment provision of the Eighth Amendment.

■ Without regard for minutiae of conclusion in the trial court's opinion, we think it misinterpreted the ruling of the Supreme Court in Collins v. Johnston, supra. While it is true that the Eighth Amendment to the Constitution of the United States limits and was intended to limit federal action, it is the modern view, and, we feel, the correct one, that where the right protected and guaranteed under the Bill of Rights (Amendments I to VIII) of the United States Constitution is "basic" and "fundamental" to the rights of life and liberty, recognized and guaranteed by the Constitution of the United States, then the due process clause of the Fourteenth Amendment prohibits a state from abridging or denying the right in question.

In so holding, we are not unmindful of the fact that the Supreme Court of the United States has repeatedly declined to adopt the view that the Fourteenth Amendment was intended to make secure against state invasion all the rights, privileges and immunities protected from federal violation by the Bill of Rights. Chambers v. Florida, 309 U.S. 227, 235-236, note 8, 60 S.Ct. 472, 84 L.Ed. 716; see also e. g., Twining v. New Jersey, 211 U.S. 78, 98-99, 114, 29 S.Ct. 14, 53 L.Ed. 97, Mr. Justice Harlan dissenting; Maxwell v. Dow, 176 U.S. 581, dissent 605, 606, 20 S.Ct. 448, 44 L.Ed. 597; Palko v. Connecticut, 302 U.S. 319, 323, 325, 326, 58 S.Ct. 149, 82 L.Ed. 288; Hague v. C.I.O., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423.

■ But in numerous cases the Supreme Court has held that where the right invaded by the state is a "basic" and "fundamental" one, the due process clause of the Fourteenth Amendment include by implementation those guarantees of the Bill of Rights. E. g. freedom of speech, Saia v. New York, 334 U.S. 558, 560, 68 S.Ct. 1148, 92 L.Ed. 1574; freedom of religion, Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352; Marsh v. Alabama, 326 U.S. 501, 508-509, 66 S.Ct. 276, 90 L.Ed. 265; freedom of the press, Lovell v. Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949; freedom of speech and assembly, Hague v. C.I.O., supra; the right to counsel in criminal prosecutions of those individuals, who, by reason of age, ignorance or mental capacity, are incapable of representing themselves adequately in a prosecution of a relatively simple nature, Wade v. Mayo, 334 U.S. 672, 684, 68 S.Ct. 1270, 92 L.Ed. 1647; and see also Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527; Betts v. Brady, 316 U.S. 455, 461, 62 S.Ct. 1252, 1256, 86 L.Ed. 1595;[8] Palko v. Connecticut, supra, 302 U.S. at pages 324-325, 58 S.Ct. 149, 151,

---

[8] The Court said: "The Sixth Amendment of the national Constitution applies only to trials in federal courts. The due process clause of the Fourteenth Amendment does not incorporate, as such, the specific guarantees found in the Sixth Amendment although a denial by a state of rights or privileges specifically embodied in that and others of the first eight amendments may, in certain cir-

82 L.Ed. 288;[9] and in particular see State of La. ex. rel. Francis v. Resweber, 329 U.S. 459, 463, 67 S.Ct. 374, 384, 91 L.Ed. 422, where the Supreme Court by Mr. Justice Reed indicated, without expressly deciding, that violation of the principles of the Fifth and Eighth Amendments as to double jeopardy and cruel and unusual punishment would be violative of the due process clause of the Fourteenth Amendment.[10]

██ We are not called on to decide, nor do we decide, whether the clauses of the Eighth Amendment relating to imposition of excessive bail, or excessive fines, fall within the ambit of the Fourteenth Amendment. But we entertain no doubt that the Fourteenth Amendment prohibits the infliction of cruel and unusual punishment by a state. State of La. ex rel. Francis v. Resweber, supra. Compare Weems v. United States, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793, 19 Ann.Cas. 705; In re Kemmler, 136 U.S. 436, 447, 10 S.Ct. 930, 34 L.Ed. 519. We are of the opinion that the right to be free from cruel and unusual punishment at the hands of a State is as "basic" and "fundamental" a one as the right of freedom of speech or freedom of religion. And it should be pointed out that actions of the employees of the prison system of Georgia must be deemed to be those of the State of Georgia. The fact that a state officer acts illegally cannot relieve a state of responsibility for his acts. Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495, 162 A.L.R. 1330.

██ We come then to the question as to whether the actions of Georgia prison authorities described by Johnson and his witnesses constituted cruel and unusual punishment. It will be remembered that the court below found that there was "evidence that Johnson received cruel treatment after he had been convicted of murder and while he was serving his sentence * * *." The learned trial judge did not expressly state that he found this evidence to be credible though, as we have said, the statement made by the court below in its opinion and heretofore referred to constituted a finding that Johnson had been subjected to cruel and unusual punishment following his conviction.[11] In any event upon appeal in a habeas corpus case all questions of law or fact arising upon the record, including the evidence, are open to consideration by the appellate court and the trial court has no authority to make conclusive findings of fact as in the ordinary action, Johnson v. Sayre, 158 U.S. 109, 15 S.Ct. 773, 39 L.Ed. 914, and we are not bound by the conclusions of the trial court, Carruthers v. Reed, 8 Cir., 102 F.2d 933, 937. The hearing before this court is technically de novo. It is our conclusion upon careful consideration of the record in the court below that Johnson was subjected to cruel and unusual punishment following his sentence and that this holding is in accordance, and not at variance, with that of the court below. Indeed no other conclusion would be possible in view of the known facts concerning the working of the Georgia penal system at the time of the petitioner's sentence and in consideration of the circumstance that the State of Georgia offered no testimony

---

cumstances, or in connection with other elements, operate, in a given case, to deprive a litigant of due process of law in violation of the Fourteenth."

9 The Court said: "In these and other situations immunities that are valid as against the federal government by force of the specific pledges of particular amendments have been found to be implicit in the concept of ordered liberty, and thus, through the Fourteenth Amendment, become valid as against the states."

10 Mr. Justice Burton, dissenting, stated for himself, for Mr. Justice Douglas, Mr. Justice Murphy and Mr. Justice Rutledge: "We believe that if the facts are as alleged by the relator the proposed action is unconstitutional." Mr. Justice Frankfurter concurred in the majority opinion but did not commit himself to a definition of ·the reach of the Fourteenth Amendment.

11 At the reargument of this case before the court en banc one of Dye's counsel, an Assistant District Attorney of Allegheny County, Pennsylvania, conceded that if Johnson had been subjected by the State of Georgia, following his conviction, to cruel and unusual punishment he was entitled to be discharged from custody and to go free. The Assistant District Attorney, however, did not concede that the court below had made a finding that Johnson had been subjected to cruel and unusual punishment.

whatsoever in contradiction to that given by Johnson and his witnesses.

Our conclusion that Johnson was subjected to cruel and unusual punishment is buttressed by the decision of the Supreme Court in In re Kemmler and Weems v. United States, supra. Weems, under Section 56 of the Penal Code of the Philippine Islands, Act of July 1, 1902, had been guilty and had been sentenced inter alia "to the penalty of fifteen years of cadena together with the accessories of Section 56 of the [Philippine] Penal Code * * *." The cadena consisted of a chain at the ankle hanging from the wrists to be worn at all times. The "accessories" of Section 56 would have deprived Weems almost completely of personal and familial rights and subjected him to constant surveillance by the authorities. The Supreme Court of the United States, by Mr. Justice McKenna, decided that the punishment was a cruel and unusual one. Accordingly the judgment was reversed and the trial court was directed to dismiss the proceedings. Though the Supreme Court has not set down any precise standard as to what constitutes cruel and unusual punishment, Wilkerson v. Utah, 99 U.S. 130, 135-136, 25 L. Ed. 345, we conclude without hesitation that if Johnson was treated by the prison authorities of Georgia in the manner which he alleges,[12] he was subjected to cruel and unusual punishment by the State of Georgia. We know of no way in which degrees of cruelty may be measured coldly as if upon an altimeter, so much for the heights of cruelty, so much for the depths thereof.

The obligation of a State to treat its convicts with decency and humanity is an absolute one and a federal court will not overlook a breach of that duty. The Supreme Court so held in effect in the Weems case though the punishment of the cadena had been imposed by a Territorial Court of the Philippines. The obligation not to inflict cruel and unusual punishment laid upon a State by the Constitution of the United States must be deemed to be positive and binding. In the Weems case cruel and unusual punishment reasonably was to be anticipated under the sentence. In the instant case, cruel and unusual punishment already has been inflicted on Johnson as the court below and we ourselves have found. History is as potent a force as anticipation. It follows, therefore, that Johnson must be set at liberty for the State of Georgia has failed signally in its duty as one of the sovereign States of the United States to treat a convict with decency and humanity. It must be pointed out also that she has failed also to observe the explicit mandates of her own Constitution [13] which pointedly, as if the very evil here under consideration was in mind, go as far, if not farther, than those of the Eighth Amendment to the Constitution of the United States.

*No Necessity to Exhaust State Remedies.*

The doctrine of exhaustion of State remedies in habeas corpus cases does not apply to extradition. This court in United States ex rel. Darcy v. Superintendent of County Prisons, 3 Cir., 1940, 111 F. 2d 409, 411, certiorari denied 311 U.S. 662, 61 S.Ct. 19, 85 L.Ed. 425, stated: "The right of the State of California to demand the rendition of the relator from the State of Pennsylvania is found in Article IV, Section 2, clause 2 of the Constitution of the United States. This clause is not self executing but is made effective by act of Congress [then Section 662 of Title 18 U.S.C.A., now Section 3182 of Title 18 U.S.C.A.]. The Supreme Court has construed this act as placing the burden upon the governor of the asylum state to determine, before complying with the demand,

---

[12] We shall not set out in this opinion the revolting barbarities which Johnson and his witnesses state were habitually perpetrated as standard chain gang practice. To perpetrate these atrocities in an opinion is to be unfair to the American scene as a whole and to reflect little credit on this generation for posterity. It is enough to state that leg-irons and most frequent beatings were among the "minor" constant cruelties.

[13] Article 1, § 1, par. 9, of the Bill of Rights of the Georgia Constitution of 1877, readopted without amendment in 1945, provides, "Bail; fines; punishments; arrest; abuse of prisoners.—Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted; nor shall any person be abused in being arrested, while under arrest, or in prison."

whether the person demanded is substantially charged with a crime and whether he is a fugitive from justice. This determination may be made by the governor without a hearing, but if the alleged fugitive considers himself aggrieved by the order he may obtain a hearing upon writ of habeas corpus. The writ may be allowed either by a state or a federal court," citing upon the last point referred to Roberts v. Reilly, 116 U.S. 80, 6 S.Ct. 291, 29 L.Ed. 544; Drew v. Thaw, 235 U.S. 432, 35 S.Ct. 137, 59 L.Ed. 302; Biddinger v. Commissioner of Police, 245 U.S. 128, 38 S.Ct. 41, 62 L.Ed. 193, and Hogan v. O'-Neill, 255 U.S. 52, 41 S.Ct. 222, 65 L.Ed. 497. It was held by the Court of Appeals for the Seventh Circuit in United States ex rel. McCline v. Meyering, 75 F.2d 716, 718, that if a petitioner had begun a proceeding in a State court for habeas corpus he could nonetheless discontinue that proceeding and file his petition for relief in a federal district court. See also 22 Am. Jur., Extradition, Section 54, p. 293, where it is stated: "After the governor causes, by his warrant, the arrest and delivery of a person charged as a fugitive from justice from another state, the prisoner, since he is held under color of authority derived from the Constitution and laws of the United States, may invoke the judgment of the Federal, as well as the state, tribunals on the lawfulness of his arrest and imprisonment." See also 135 A.L.R. at page 985.

In a per curiam opinion in the case of Powell v. Meyer, 3 Cir., 1945, 147 F.2d 606, 607, this court overruled its decision in United States ex rel. Darcy v. Superintendent of County Prisons sub silentio relying upon the decision of the Court of Appeals for the Fourth Circuit in Sanderlin v. Smyth, 138 F.2d 729. The Sanderlin case, however, was not in point for in that case the application for habeas corpus was made to release the petitioner from a sentence imposed by a state court and the usual rule of exhaustion of state remedies necessarily applied. As we have said, the rule of exhaustion of state remedies does not apply where habeas corpus is sought to avoid extradition. We adhere to the rule which we announced in United States ex rel. Darcy v. Superintendent of County Prisons and overrule our decision in Powell v. Meyer. It follows that Johnson had the right to maintain the proceeding in the District Court in the instant case and we entertain no doubt but that he is entitled to his liberty.

Accordingly the judgment of the court below will be reversed and the cause will be remanded with the direction to issue the writ and to discharge the petitioner.

O'CONNELL, Circuit Judge (concurring in part, dissenting in part).

I agree with my brethren that, just as the Eighth Amendment forbids the infliction of cruel and unusual punishment by the federal government, the Fourteenth Amendment includes a similar prohibition against states. Regardless of his guilt or innocence of the murder charge lodged against him, Johnson never lost—and still has—the absolute right not to be subjected to cruel and unusual punishment wherever the Constitution of the United States is the supreme law.

Further, I agree that habeas corpus may be here utilized to vindicate Johnson's constitutional right. It is not without reluctance that I reach this conclusion, however; for (1) I remain keenly aware that, because Georgia chooses to disregard the mandates of the Eighth Amendment and of its own constitution, this court turns loose a convicted murderer among the law-abiding citizens of Pennsylvania, a state which has expressly refused to harbor him; (2) also, I entertain considerable doubt whether an impenitent Georgia administration would be deeply grieved by a decision which permits Georgia to utilize the other 47 states as penal colonies for its "escaped" prisoners.[1] I nevertheless bow to the exigencies of the situation; better it be that a potentially dangerous individual be set free than that the least degree of impair-

---

[1] It should not be assumed too quickly that Georgia is zealous in guarding its prisoners and vigorously pressing for their extradition when they escape and flee into other states. As indications of the attitude of Georgia, I cite the following:

(a) The court below stated that about

ment of an individual's basic constitutional rights be permitted.

An initial difficulty with which the opinion of the majority confronts me, however, is that it not only substitutes its own finding of fact for an inconclusive statement of the court below, but also deems no conclusion possible other than that Johnson suffered cruel and unusual punishment prior to his flight from Georgia. True, several witnesses testified to "the known facts concerning the working of the Georgia penal system at the time of the petitioner's sentence"; but, in the court below, only one witness professed to actual knowledge of how *Johnson,* and not chain-gang prisoners in general, was treated: Johnson himself. I think that Johnson may well have told substantial truth when he described his chain-gang ordeals; and I think the district court had ample basis for making such a critical finding of fact; but I see no reason why this court should invade the province of the court below and insist that credibility be attached to Johnson's testimony. It must be recalled that the burden of proof of his allegations lay with Johnson, whose testimony is to be viewed in the light that he has a vital interest in the outcome, and who has been disbelieved by other courts.[2] The case at bar seems to me one particularly appropriate for adherence to the usual procedure of leaving the finding of facts to the court of first instance.

If I assume nevertheless that my brethren are correct in holding that Johnson did receive cruel and unusual punishment in Georgia, I believe that this alone should not be assigned as the reason for Johnson's enlargement. The record before this court contains other factors which seem to me essential to consider and pertinent to our decision. The Johnson whose fate we are determining is more than a convicted murderer in the eyes of Georgia officialdom. He is a Negro who has broken imprisonment and who has made virulent accusations against the white officials and guards of the Georgia public works camp. In the absence of persuasive evidence of effective steps toward reform in Georgia, I think it would be ingenuous to expect those Georgia authorities to accord to Johnson's constitutional rights greater respect than this court finds was conceded to Johnson during his Georgia imprisonment. This court is in a position, therefore, where it need not, and should not, declare that the drastic remedy here announced is one which will lie whenever there has been, in the past, an infliction of cruel and unusual punishment. I deem it sufficient that we invoke our power to release an individual who not only has suffered cruel and unusual punishment but also faces grave and imminent danger of like abuse and very possibly even death by extra-legal means, if he is returned to Georgia.

If, nevertheless, this court must choose between past and prospective violation of a basic constitutional right as the ground for

---

175 other prisoners had escaped at the same time as Johnson.

(b) One of those who testified in the court below concerning the treatment given Georgia chain-gang prisoners was one Moreland, also a fugitive from Georgia justice. Judge Samuel A. Weiss, of the Court of Common Pleas of Allegheny County, Pennsylvania, in an opinion granting Moreland's petition for habeas corpus, recited this testimony of Moreland: " * * * that the Warden observed his [Moreland's] departure and made no objections; that he proceeded to the town of Thomasville, Georgia, where he received medical attention in the local jail under supervision of the Chief of Police. He then was released and proceeded to Atlanta, Georgia, his bus fare having been paid by the Chief of Police."

(c) As the majority opinion notes, Johnson's other witnesses, except for

one, were also escaped Georgia convicts who happened to be in the Allegheny County Jail.

(d) The State of Georgia failed to express its position as to Johnson's petition, not only in the district court, but also at both hearings in this court, although in the order directing rehearing this court specifically invited the attorney general of Georgia "to appear amicus curiæ and to file a brief herein if he so desires."

[2] At his murder trial in Georgia, Johnson limited his defense to his written statement alleging that the homicide was accidental; but the jury found him guilty of murder. As to Johnson's testimony in his habeas corpus hearing in the Court of Common Pleas of Allegheny County, the Superior Court of Pennsylvania stated that the record "affirmatively shows him to be an untrustworthy witness." 49 A.2d at page 197.

release of an individual, I should prefer to place reliance upon the latter. I think the cases support this view. Thus, in Francis v. Resweber, 1947, 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422, the Supreme Court of the United States entertained writs based upon the claim that execution of that petitioner would constitute cruel and unusual punishment and thereby deny him due process; and, while the court was not unanimous in either reasoning or result, all its members seem to me to have endorsed the concept that the courts may prevent threatened violations of a constitutional right like that here involved.[3] Likewise, in Weems v. United States, 1910, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793, 19 Ann.Cas. 705, the Supreme Court, reversing a judgment because the sentence violated the bill of rights, placed great stress upon the punishment which the sentence would impose upon Weems in the future; see 217 U.S. at pages 366, 373, and 381, 30 S.Ct. 544, 54 L.Ed. 793, 19 Ann. Cas. 705. The logic of invoking the judicial power to eliminate a threatened invasion of a basic constitutional right seems to me irresistible.

As my foregoing comments indicate, I have grave doubts whether past infringement of Johnson's constitutional right would of itself entitle him to release. Were the state of Georgia actually in loco penitentiae, it might well be expected that criminal and civil sanctions could and would be applied, by effective legal process in that state, against those responsible for the cruel and unusual punishment visited upon Johnson. Cf. In re Birdsong, D.C.S.D.Ga. 1889, 39 F. 599, 4 L.R.A. 628, and Howard v. Arizona, 1925, 28 Ariz. 433, 237 P. 203, 40 A.L.R. 1275. As far as I can see, however, it is not contended that crudities of the Georgia authorities were the equivalent of a pardon for the murder of which Johnson was convicted. For the purposes of the petition before us, the guilt or innocence of Johnson is not in issue. Also, it seems clear that the sentence of the Georgia county court, unlike that involved in Weems v. United States, supra, was not so erroneous as to entitle Johnson to discharge on habeas corpus. Consequently, still outstanding against him, and only incidentally affected by the treatment he has received, is a valid determination by properly-constituted authority that Johnson be imprisoned for life. Could this penalty be served, with observance of those constitutional rights which prisoners retain, cf. Coffin v. Reichard, 6 Cir., 1944, 143 F.2d 443, 445, 155 A.L.R. 143, I think it would be both unwise and improper for this court to restrain Pennsylvania from honoring a request by Georgia for his extradition.

My position may be readily illustrated by a hypothetical case. Let us assume that two individuals, X and Y, are indicted on a charge of murder, that the trial judge erroneously compels them to take the stand and answer incriminating questions, and that both X and Y are convicted. Shortly thereafter, X escapes to another state, while Y appeals and obtains a reversal of the conviction. Under the majority ruling as I interpret it, X is spared the possibilities of extradition and a new trial, since a fundamental constitutional right was denied him; while Y must face trial again. Is not this an incongruous result? If the fact be added, however, that it seems likely that X or Y will be required at a new trial again to testify against himself, I can see sound reasons for a court to intervene, on behalf of either X or Y, and forbid the step which makes it possible for the fresh constitutional violation to be consummated.

For the reasons stated, I believe the judgment of the court below should be vacated and the cause remanded for a determination whether Johnson has suffered cruel and unusual punishment and would be reasonably likely to undergo similar abuse if he were returned to Georgia, the disposition of his petition to be dependent upon those critical findings.

---

3 " * * * if the *proposed* punishment amounts to a violation of due process of law under the Constitution of the United States, then the State must find some means of disposing of this case that *will not* violate that Constitution." Mr. Justice Burton, 329 U.S. 459, at page 481, 67 S.Ct. 374, at page 385, 91 L.Ed. 422; emphasis supplied. Cf. opinion of Mr. Justice Reed, 329 U.S. at page 464, 67 S.Ct. 374, 91 L.Ed. 422, and last sentence of concurring opinion of Mr. Justice Frankfurter, 329 U.S. at pages 471–472, 67 S.Ct. 374, 91 L.Ed. 422.